FILED
2012 Dec-06  AM 08:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

JEFFERY A. CLARK, III,          )
                                )
            Plaintiff           )
                                )
      vs.                       )          Case No.  1:09-cv-02497-HGD
                                )
APAC MID-SOUTH, INC.,           )
                                )
            Defendant           )

## MEMORANDUM OPINION

On December 11, 2009, plaintiff Jeffery A. Clark, III, ("Clark") an African-American, initiated this civil action with a two-count complaint filed in the Northern District of Alabama against defendant APAC Mid-South, Inc., ("APAC") alleging race discrimination and retaliation in violation of 42 U.S.C. § 1981 ("Section 1981") and Title VII of the Act of Congress, 42 U.S.C. § 2000(e), *et seq.* (Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991) ("Title VII").  Clark demands a trial by jury, monetary damages, and injunctive relief.

This case is before the undersigned magistrate judge pursuant to the parties' consent.  *See* 28 U.S.C. § 636(c); Rule 73(a) of the *Federal Rules of Civil Procedure*; LR 73.2; and the General Orders of Reference dated July 25, 1996, May 8, 1998, as

amended July 27, 2000, specifically at ¶ 3.  APAC has filed a motion for summary judgment, briefs, and evidentiary submissions.  (Docs. 18, 19 & 20).[1/]  Clark tendered a response and evidentiary submissions.  (Docs. 27 & 28).  APAC  filed a reply brief and additional evidentiary submissions.  (Doc. 30).  The parties have supplemented their evidentiary submissions at the direction of this court.  (Docs. 36 & 37).

## I.  APPLICABLE LAW

### A.  Summary Judgment - General Standard

Summary judgment is proper when no genuine issue as to any material fact is present, and the moving party is entitled to a judgment as a matter of law.  Federal Rule of Civil Procedure 56(a).  APAC carries the initial burden of "informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact."  *Rice-Lamar v. City of Ft. Lauderdale,* 232 F.3d 836, 840 (11th Cir. 2000) (citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323 (1986)).  "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material

---

[1/]  References herein to "(Doc. ___ at ___ )" are to the electronic document and page numbers assigned by the Clerk of Court.   When a surname appears before a document number (*e.g.* "Clark, Doc. ___ at ___ ), " it is intended to refer to a witness's deposition and the clerk's document number. However, the page number for deposition citations shall be to the number on the transcript.

issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party then is required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like designating "specific facts showing there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "The mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

The reviewing court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Id*. at 248. "[F]acts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of facts for the purpose of ruling on a motion for summary judgment." *Id.* If the record does not blatantly contradict the non-movant's versions of events, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *See Anderson*, 477 U.S. at 252; *see also EPL, Inc. v. USA Federal Credit Union*, 173 F.3d 1356, 1362 (11th Cir. 1999).

**B.**   **Title VII and Section 1981 Claims - General Analytical Framework**

Clark relies upon Title VII and Section 1981 to support his race-based employment discrimination claims. Title VII prohibits employers from discriminating against any individual with respect to the terms of employment on the basis of race. Title VII also contains a separate anti-retaliation provision that forbids an employer from intentionally discriminating against an employee for engaging in activity protected by Title VII.   Section 1981 prohibits race-based discrimination and retaliation in the making and enforcement of contracts. *CBOCS West, Inc., v. Humphries*, 553 U.S. 442, 445-46 (2008).   Since both laws have the same proof requirements, unless otherwise noted, all claims shall be addressed under the Title VII moniker. *See Bryant v. Jones*, 575 F.3d 1281,1307 (11th Cir. 2009) (quoting *Standard v. A.B.E.L.. Services*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("stating that Title VII and § 1981 'have the same requirements of proof . . .'")).

A plaintiff may establish a claim of discrimination or retaliation by direct, circumstantial, or statistical evidence.  For claims based only upon circumstantial evidence, as is the case in the present action, the Eleventh Circuit Court of Appeals has adopted the three-step burdenshifting framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-08 (1973). *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004); *Chapman v. AI*

*Transportation*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc).  This analytical framework applies to Clark's Title VII and Section 1981 claims.[2/]

Under the framework, the plaintiff bears the initial burden of proving a *prima facie* case.  *McDonnell Douglas Corp.,* 411 U.S. at 802.  Once a *prima facie* case is established, the burden then shifts to the employer to state a legitimate, nondiscriminatory reason for the challenged action.  *Id.* at 802-03.  An employer's burden to articulate a non-discriminatory reason for its action is a burden of production, not of persuasion.  *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  This burden involves no credibility determination, *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 509 (1993), and therefore it is an "exceedingly light" burden.  *Perryman v. Johnson Prod. Co.,* 698 F.2d 1138, 1141 (11th Cir. 1983).  The employer must simply articulate "a clear and reasonably specific" non-discriminatory basis for its actions to discharge its burden of production.  *Burdine,* 450 U.S. at 254-55.  After the employer discharges its burden, the burden shifts back to the plaintiff to show that the reason offered by the employer was a pretext for discrimination or retaliation.  *McDonnell Douglas Corp.,* 411 U.S. at 804.  At the pretext stage, the court's concern is not whether the employment

---

[2/]  *See Bryant v. Jones*, 575 F.3d 1281, 1307-1308 (11th Cir. 2009) (Title VII/Section 1981 retaliation); *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330-31 (11th Cir. 1998) (Title VII/ Section 1981).

decisions are prudent or fair but whether unlawful discriminatory or retaliatory animus motivates the challenged employment decision.   *Damon v. Fleming Supermarkets of Florida,* 196 F.3d 1354, 1361 (11th Cir. 1999).

In other words, once a defendant articulates a legitimate, non-discriminatory reason for its action, the initial inference of discrimination "drops" from the case. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. at 510-11.  The burden then shifts back to the plaintiff to show that the proffered reason was pretext for intentional discrimination and that the defendant intentionally discriminated against him. *Burdine*, 450 U.S. at 256; *Chapman,* 229 F.3d at 1024.  Plaintiff's evidence must reveal "such weaknesses, implausibilities, inconsistencies, incoherences or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Cooper v. Southern Co.,* 390 F.3d 695, 725 (11th Cir. 2004).

The plaintiff may not simply quarrel with the wisdom of the reason proffered "but must meet it head on and rebut it." *Chapman*, 229 F.3d at 1030.  Federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high handed its decisional process, no matter how mistaken the firm's managers," the courts do not interfere.  *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)

(quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988) (citations omitted)).  A plaintiff may show pretext and survive summary judgment by "presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, nondiscriminatory reasons." *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 965 (11th Cir. 1997) (citations omitted); *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1269 (11th Cir. 1999).

## II.  STATUTES OF LIMITATION, ABANDONED AND UNPLED CLAIMS

**A.**   **Statutes of Limitation**

**1.**   ***Any adverse decisions arising in 2005 are untimely under Section 1981 and Title VII***

Out of an abundance of caution, APAC argues that to the extent Clark may be

> attempting to make any [Section 1981] claims related to alleged adverse employment actions occurring in 2005, such claims are due to be dismissed as untimely because plaintiff filed the lawsuit in the instant case on December 11, 2009, more than four years from the date of any of the alleged 2005 actions.  *See e.g., Summerlin v. M&H Valve Co.*,  [---- F. Supp. 2d ----, ----, 2005 WL 6132650, at ]* 10-12 (N.D. Ala. Jan. 31, 2005) (citing *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004) and explaining that statute of limitations for Section 1981 claims is either two or four years depending on nature of claim).  Any of plaintiff's [Title VII] claims related to his first EEOC Charge that was filed in November of 2005 and was dismissed with a Notice of Right to Sue in

> September 2006, are likewise untimely because plaintiff
> did not file this lawsuit within 90 days of the issuance of
> the Right to Sue Notice.   See 42 U.S.C. § 42 U.S.C.
> § 2000e-5(f)(1).

(Doc. 19 at 12) (citation omitted) (brackets added).

Clark's complaint does not appear to state any Section 1981 or Title VII claims arising from a 2005 EEOC charge.  (Doc. 1 at 1-8).  Moreover, he does not dispute that any claims determined to have arisen in 2005 would be barred by the longest possible limitations period applicable to Section 1981 and that he did not file a Title VII lawsuit against APAC within 90 days of his receipt of the September 2006 EEOC dismissal.  (Doc. 27).  In fact, Clark does not address any of APAC's timeliness arguments in his response.  (*Id.*).

Accordingly, to the extent that Clark may be attempting to aver Title VII or Section 1981 causes of action pertaining to any adverse employment decisions that occurred in 2005, those causes of actions are barred by the applicable statutes of limitations discussed above.  As such, APAC's motion for summary judgment as to any Section 1981 and Title VII claims that arose in 2005 is due to be **GRANTED** and those claims are due to be **DISMISSED WITH PREJUDICE.**

2.    *Clark's 2007 failure to promote claims are untimely under Section 1981*

APAC declares that Clark's 2007 failure-to-promote claims under Section 1981 are untimely because the "decisions that. involved promotions from hourly non-management jobs to salaried management positions were made no later than July of 2007 . . . , and [Clark] filed this lawsuit more than two years from the date of those promotional decisions."  (Doc. 19 at 13) (citing *Summerlin v. M&H Valve Co.*, [----F. Supp. 2d ----, ----, 2005 WL 6132650, at ]* 10-12 (N.D. Ala. Jan. 31, 2005)). Clark's opposition contains no reasoned argument to counter APAC's contention that the 2007 failure-to-promote claims are subject to and therefore barred by Section 1981's two-year statute of limitations.  (Doc. 27).  For the reasons following, this court finds APAC's motion to be well-founded.

It is well known that a plaintiff is not required to exhaust his administrative remedies before filing an action under 42 U.S.C. § 1981.  *Patterson v. McLean Credit Union*, 491 U.S. 164, 181 (1989), *superseded by statute as stated in Jones v. R.R. Donnelley & Sons, Co.*, 541 U.S. 369, 383 (2004).  Nevertheless, the suit still must be timely filed.  Prior to 1990, courts were to apply the most analogous state statute of limitations to § 1981 claims, which was two years under Alabama law.  *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 661-62 (1987), *superseded by statute as stated in*

*Jones*, 541 U.S. at 383; *Moore v. Liberty Nat'l Life Ins. Co.*, 267 F.3d 1209, 1219 (11th Cir. 2001).  In 1990, Congress enacted 28 U.S.C. § 1658(a), which created a default four-year limitations period for federal causes of action created after that date. 28 U.S.C. § 1658.  One year later, as part of the Civil Rights Act of 1991, Congress amended § 1981 to include a cause of action for race discrimination in the terms and conditions of employment.  42 U.S.C. § 1981.

In *Jones v. R.R. Donnelley & Sons Co.*, the Supreme Court determined that Congress's 1990 enactment of § 1658 changed the limitations period to four years for some claims under § 1981.  *Jones*, 541 U.S. at 377-80.  The Court explained that to the extent that the Civil Rights Act of 1991 created new causes of action not previously cognizable under § 1981, such claims are subject to the four-year "catch-all" statute of limitations of § 1658.  *Id.* at 380-83.

Prior to the Civil Rights Act of 1991, a failure-to-promote claim was actionable under § 1981 "[o]nly where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and employer." *Patterson*, 491 U.S. at 185-86.  Clark does not dispute that the skilled positions he performed at APAC were hourly, non-supervisory positions at APAC, while the Foreman and Superintendent positions were salaried positions with managerial functions.

The 2007 promotions described in Clark's complaint rise to the level of an opportunity for a new and distinct relation between Clark and APAC and thus would have been actionable under § 1981 prior to the Civil Rights Act of 1991. *See id.* Any action brought pursuant to the 2007 promotions under § 1981 must have been filed by 2009 to be timely. *See Goodman*, 267 F.3d 1219. Therefore, the court concludes that, to the extent Clark claims that APAC failed to promote him to the 2007 Foreman and Superintendent positions, the claims are time barred under § 1981.

APAC's motion for summary judgment as to any discrete Section 1981 failure-to-promote claims that arose in 2007 is due to be **GRANTED** and these claims **DISMISSED WITH PREJUDICE**.

B.    **Abandoned Claims**

"When a party moves for final . . . summary judgment, 'it [becomes] incumbent upon the [nonmovant] to respond by, at the very least, raising in their opposition papers any and all arguments or defenses they felt precluded judgment in [the moving party's] favor.'" *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) (quoting *Johnson v. Bd. of Regents*, 263 F.3d 1234, 1264 (11th Cir. 2001)). Moreover,

> [t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990). Rather, the onus is upon the parties to formulate

arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned. *Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986)), cert. denied, --- U.S. ----, 115 S. Ct. 189, 130 L. Ed. 2d 122 (1994).

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

With these principles in mind, the court finds that Clark has abandoned three claims.

1.  ***Title VII/Section 1981 race discrimination in discipline and termination between December 2007[3/] and February 2008***

APAC declares that Clark did not respond to its motion for summary judgment regarding his race-discrimination claims with the underlying basis being three discrete acts of discipline and termination between December 2007 and February 8, 2008.  (Doc. 18 at 2-3, ¶¶ 6-8 & 11-12); (Doc. 19 at 15-16, 21-23 & 24-25); (Doc. 30 at 6).  APAC is correct, and these claims are due to be dismissed with prejudice.

_____

[3/]  The December 2007 date utilized by APAC for one of the disciplinary actions is identified by Clark as occurring on February 1, 2008.  The following facts explain why.  On November 8, 2007, Clark had a motor vehicle accident on the job.  The Area Safety Director, Anthony Nicholson, investigated the accident and concluded that Clark was at fault.  Nicholson declares he signed a written disciplinary to that effect on December 21, 2007, and he punished Clark by placing him on six months' probation.  Nicholson asserted that he was unable to give Clark a copy of the disciplinary until February 1, 2008, because his duties as Area Safety Director required extensive travel.  Thus, APAC identifies the disciplinary by the date Nicholson signed it, and Clark identifies the disciplinary by the date he received it.

## 2.  *Title VII race discrimination for failure to promote to 2007 Asphalt Superintendent position*

APAC also moves for summary judgment as to Clark's race-discrimination failure-to-promote claim in connection with the 2007 Asphalt Foreman positions and the Asphalt Superintendent position.  (Doc. 18 at 1-2, ¶¶ 2-3); (Doc. 19 at 15-21). Clark's opposition to the motion for summary judgment is dedicated exclusively to 2007 Asphalt Foreman positions.  (Doc. 27 at 28-32).  There is no mention of or argument in opposition to APAC's motion for summary judgment as to the Asphalt Superintendent position.  (*Id.*).  Since Clark has abandoned the Asphalt Superintendent failure-to-promote claim, it is due to be dismissed with prejudice.

## 3.  *Title VII/Section 1981 discrete retaliation claim, with the underlying allegation being a rescinded January 10, 2008, reprimand*

APAC additionally moves for summary judgment with regard to Clark's assertion that Asphalt Foreman David Wright issued him a written reprimand on January 10, 2008, in retaliation for his having filed an EEOC charge on December 14, 2007.  (Doc. 18 at 2, ¶¶ 6-7); (Doc. 19 at 16-17, 22).  APAC declares that Clark never signed the reprimand, and the document was rescinded by Wright's immediate supervisor, Asphalt Superintendent David Smith.  (Doc. 19 at 16-17).  Since Clark was not subjected to any adverse employment action, APAC declares the claim is due to be dismissed.  (*Id.*).  Clark makes no arguments concerning retaliation and the

rescinded January 10, 2008, reprimand in his opposition to APAC's motion for summary judgment. Thus, he has abandoned this claim, and it is due to be dismissed with prejudice, as well.

In conclusion, the onus is upon Clark to formulate arguments in opposition to APAC's motion for summary judgment. Clark has failed to do so in connection with each of the claims described above. Accordingly, APAC's motion for summary judgment is due to be **GRANTED** and these claims **DISMISSED WITH PREJUDICE**.

## C.    <u>Unpled Claims</u>

In his opposition to APAC's motion for summary judgment and brief, Clark either makes or references arguments concerning causes of action that clearly were not alleged in his complaint. (Doc. 27). First, at the end of his argument in support of his race discrimination failure-to-promote claims he writes, "the disparate treatment and disparate impact of failing to train Plaintiff in electronics is also a violation of his Title VII rights." (*Id.* at 32). There is no semblance of a failure to train claim in his complaint. While "the Supreme Court has mandated a liberal pleading standard for civil complaints under Federal Rule of Civil Procedure 8(a)[, t]his standard . . . does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage." *Gilmour v. Gates, McDonald and Co.*,

382 F.3d 1312, 1314 (11th Cir. 2004) (citing *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512 (2002)). Accordingly, the unpled Title VII failure to train claim **SHALL NOT BE CONSIDERED**.

Additionally, after its argument in support of summary judgment against Clark as to the race discrimination failure-to-promote claims, APAC proclaims "[t]o the existent that plaintiff is claiming that his [2007] denial of promotions is retaliatory" for Clark having filed EEOC charges in 2005, "this claim likewise fails." (Doc. 19 at 20-21). However, Clark's complaint does not contain any claim that APAC denied him the 2007 promotions in retaliation for having engaged in any protected activity. (Doc. 1 at 5-6). In his opposing argument to APAC's motion for summary judgment Clark, points out that "[*t*]*he defendants argue* only that Plaintiff cannot establish one element of h[is] claims: the c[aus]al connection between h[is] engagement in protected activity and the denial of promotions and his termination." (*Id.* at 33) (brackets and emphasis added). The remainder of Clark's opposition argument is dedicated only to the retaliatory probation/termination claims he did plead in his complaint. (Doc. 27 at 33-34). Thus, even though he pointed out arguments made by APAC, Clark himself does not argue against summary judgment for a retaliation claim based on the 2007 denial of promotions nor is he attempting to adopt claim that

is not pled in the complaint.[4]  For all of the foregoing reasons, this court finds that

there is no claim that the refusal to promote Clark in 2007 was a discrete act of

retaliation.  Therefore, such a claim **SHALL NOT BE CONSIDERED**.

The claims in Clark's complaint that remain and are subject to summary

judgment review are:

> **Count I** - APAC violated Title VII in July 2007 when it failed to
> promote Clark to two asphalt foreman positions on the basis of his race,
> and
>
> **Count II** - APAC retaliated against Clark for filing EEOC charges in
> violation of Title VII and Section 1981 when it disciplined Clark on
> February 1, 2008, and terminated him on February 8, 2008.

### III.  COUNT I

### Race Discrimination- Failure to Promote to Asphalt Foreman

The burden-shifting analysis applicable to this claim begins with the

"formulation of the elements of a *prima facie* case," which  depends on the theory

underlying a particular discrimination claim.  *Rioux v. City of Atlanta, Ga.*, 520 F.3d

---

[4]  For notation purposes only, the court notes that APAC is correct that a  2 year gap between Clark's
2005 EEOC charge and the 2007 promotion denials are too remote to establish the causation element
of a retaliation claim.  (Doc. 19 at 21 (citing *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364
(11th Cir. 2007)).  In *Thomas v. Cooper Lighting, Inc.*, the Eleventh Circuit reiterated than when the
element of causation is based on "mere temporal proximity . . . [it must be] "very close."  *Id.*
(quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511, 149 L. Ed.
2d 509 (2001) (internal citations omitted)).

1269, 1275 (11th Cir. 2008) (italics added).  When a failure to promote is alleged as

the discrete discriminatory act, the plaintiff may establish *a prima facie* case by

showing that:  (1) he is a member of a protected class, (2) that he applied for and was

qualified for the position, (3) despite his qualifications he was rejected, and (4) the

position was filled by someone outside the protected class.  *Springer v. Convergys*

*Customer Management Group, Inc.*, 509 F.3d 1344, 1348 n.2 (11th Cir. 2007) (citing

*McDonnell Douglass Corp.*, 411 U.S. at 802, 93 S. Ct. 1817; *Vessels v. Atlanta Indep.*

*Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005)).

> If a plaintiff makes the requisite showing, the burden
> of production shifts to the employer to articulate a
> legitimate, nondiscriminatory reason for its actions.  *See*
> *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002)
> (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,
> 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)).   The
> employer "need not persuade the court that it was actually
> motivated by the proffered reasons."  *Tex. Dep't of Cmty.*
> *Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 67
> L. Ed. 2d 207 (1981).  Rather, if the employer "articulat[es]
> one or more reasons, then the presumption of
> discrimination is rebutted, and the burden of production
> shifts to the plaintiff to offer evidence that the alleged
> reason of the employer is a pretext for illegal
> discrimination."  *Wilson*, 376 F.3d at 1087.

*Brown v. Alabama Dept. of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010).

A.   <u>Facts</u>

All facts relevant to this claim are construed in the light most favorable to Mr. Clark with all reasonable inferences drawn in his favor.  Where a fact is undisputed by either party, inferences are drawn in favor of Mr. Clark.  Where a "fact" may be disputed, Mr. Clark's version of that fact is presumed to be true.  *Skop v. City of Atlanta, Ga.,* 485 F.3d 1130, 1136 (11th Cir. 2007).

In June 2007, Clark applied for two asphalt foreman positions with APAC, his employer of approximately 14 years.  Two other APAC employees, David Wright and Chris Waldrep, also applied for the positions.  Wright and Waldrep are white, and both had been APAC employees for less than two years.  All three applicants were given a written test as part of the process.  This written test was created by Sam Head, the Area Manager and sole decision-maker.  Clark, Wright, and Waldrep took this examination on or about June 18, 2007.  Wright scored highest on the test, followed by Waldrep and then Clark.  Thereafter, Head chose Wright and Waldrep for the positions.

     **1.**    *The education and employment history of the 2007 asphalt foreman applicants.*

       **a.**    *Jeffery Clark*

Jeffery Clark is a 1981 graduate of Anniston High School with one year of studies at Jacksonville State. Between 1985 and 1992, Clark mostly held janitorial positions with several companies. He also was a combat engineer with the Alabama National Guard from 1984 until May 1991. In 1992, Clark became employed as a Laborer at APAC and he performed skilled positions such as "flagging, raking [and] traffic control." (Clark, Doc. 20-1 at 25). Several years later, he moved up to Quality Control (which is not an asphalt position) and in 1997 he moved "back to asphalt" as a Distributor Operator. (*Id.* at 26).[5] Clark also has identified himself as being a Screed Operator.[6] All of these positions are hourly non-managerial placements on the asphalt crew.

A Distributor Operator, also known as a Tack Truck Operator, is responsible for operating a tack truck at the job site. (Clark, Doc. 20-1 at 8-10 & 13). A Screed Operator runs the screed, also known as a paver. (McKibbon, Doc. 20-6 at 22-25). There are "two ways to run a screed: [m]anually or with electronics, automation."

---

[5] While at APAC, Clark worked a second, part-time job as a Wal-Mart greeter/security for about 4 or 5 years, but stopped when the hours began to conflict with APAC hours.

[6] *See* Clark's 2005 EEOC discrimination charge, signed under oath. (Doc. 20-1 at 61). In it, Clark declared that he became a Screed Operator in 1997. (*Id.*). In the Charge Questionnaire filled out by Clark as part of the 2005 EEOC, also submitted under oath, Clark represented that he was "dist oper/screed oper." (Doc. 37 at 27 (under seal)).

(Head, Doc. 20-2 at 38-39).  With regard to the Distributor Operator position, Clark

testified that "you have to tack before you actually pave," (*id.* at 12) and that

> on the tack truck, you shot for different materials.  Some
> materials calls for more attention than others.  For instance,
> like AC, you have to get around 300 degrees.  And if you
> let it get below a certain temperature, production is messed
> up for the whole day.  So a lot of times I had to stay in the
> tack truck.

(*Id.* at 20).  If Clark did not have to remain in the tack truck or had completed tacking,

he helped with other skilled positions such as "report[ing] back to the spreader after -

tacking[,]" . . . "running the crew, running the screens, running the paver, running the

distributor, sometimes running the shuttle buggy, very seldom running the roller."

(*Id.* at 145).

In addition to the skilled positions heretofore discussed, from 1999 to 2004,

Clark acted as a temporary asphalt foreman for two or three weeks out of the year and

never was told that there were problems with his work.[7]  Clark testified that he would

take on this position when the Asphalt Foreman at the time (his brother John Clark)

reported to National Guard camp.  (Doc. 27 at 28); (Clark, Doc. 20-1 at 26-27).

---

[7]  Clark declares that "there was no record of any problems during the time [he] acted as Asphalt
Foreman and [he] was never told that there were any more problems with his asphalt than with any
one else's work."  (Doc. 27 at 29 (citing Clark, Doc. 20-1 at 114)).  Defendant APAC declares that
Clark's assertion is "unsupported by the testimony," but points to no evidence that disputes Clark's
assertion.  (Doc. 30 at 1).  As such, Clark is correct that his testimony about the matter is unrebutted.

b.   *David Wright*

David Wright's education and employment history show that after graduating high school in 2000, Wright worked at a cabinet shop in Childersburg and then as a forklift operator at New South Express.  (Wright, Doc. 20-4 at 1-14); (Doc. 20-4, Ex. 1 & 2 at 15-26).   From 2003 to 2005, Wright worked for McCartney Construction.   Wright described his position as a "Heavy Equipment Operator/Assistant Foreman" whose responsibilities were "running heavy equipment" and "managing work crew when foreman is absent."  (Doc. 20-4, Ex. 2).  Under the "skills" section of his resume, Wright declares that he was able to operate the following equipment:  asphalt paver, roller, broom, chip paver, milling machine and screws on paver.  (*Id.* at 24-25).

In 2005, Wright left McCartney Construction to become an employee at APAC. Wright was initially hired at APAC as a screed operator.  (Head, Doc. 20-2 at 41-42). Wright and Clark worked together on the same asphalt crew from 2005 to 2007 under then asphalt foreman Dannie McKibbon.[8/]   (Clark, Doc. 20-1 at 46-47).  In his 2007 application for asphalt foreman, Wright asserted that he could operate "all paving equipment."  In his May 15, 2007, application Wright described his job and duties as

---

[8/] Dannie McKibbon has worked at APAC for approximately 25 years, and 12 of those years were as an asphalt foreman.  (McKibbon, Doc. 20-8 at 8, 10).

"multiskilled operator - have managed crew while foreman was on vacation."  (Doc. 20-4, Ex. 2 at 18).

### c.    *Chris Waldrep*

The only information known about Waldrep's education and employment history is found in the deposition testimony of other employees, *infra*., and a completed copy of the June 18, 2007, asphalt foreman test from Waldrep's personnel file.  (Doc. 20-8 at 10-12).

### 2.    *The 2007 Asphalt Foreman Test and Applicant Results*

The asphalt foreman test and scores for applicants Clark, Wright, and Waldrep can be found at Attachments 1-3 to Doc. 20-8.  The test contains a total of eleven questions.  Questions one and two ask the applicant if he can read and comprehend construction plans, as well as calculate area and material volumes.  To these, Clark answered, "yes, somewhat";Wright answered, "yes"; and Waldrep answered, "yes, very well," and "yes."  Question three asks whether the applicant is proficient in the set up of electronic grade and slope systems.  Clark answered,  "No, because mangement (sic) chose not to let me learn the new system."[9/]  Wright answered, "yes,"

---

[9/]  This conclusory statement never is explained by Clark. *See additionally*, n. 16, *infra*.

and Waldrep answered, "Yes, have knowledge of setting up (and or) calibrating system 5 electronics."

Question four asks the applicant to state why he believes that he is qualified for the position.  Clark answered, "My experience with asphalt."  Wright answered, "Because I can run anything on the paving crew, I am an exellent (sic) leader.  I have been a mentor.  I have also ran the crew many times when Foreman was absent.  Foreman looks to me for answers.  I also set the electronics for every state job."  Waldrep stated, "I feel I could be very pruductive (sic) on the job and getting the job done with great quality and perfection.  In to making this company more money and making the work stand out."  Questions five to eleven are calculations questions.[10/]

_____

[10/] The questions are as follows:

5.)  Based on the factors below, what would be the paver speed in ft. per minute to achieve maximum efficiency:
    A.  Asphalt plant production - 150 tons per hour
    B.  Lane width - 13 ft
    C.  Layer thickness - 165# per square yard

6.)  What does the term 2% or "e" refer to when shown on a typical section of plans?

7.)  Compute the rate of placement of asphalt given the following:
    A.  Starting station - 9 + 54
    B.  Ending station - 39+00
    C.  Lane width- 12ft
    D.  Tons laid - 358

8.)  Using your answer from question #7:  Assume the rate of placement was supposed to be 165# per square yard, what penalties from the D.O.T. could we be subject to?

The number of correct answers for each individual are: Wright five, Waldrep four and Clark[11/] two. Clark testified that he did not know how he had done on the test until David Smith told him several months later that he did not do well. (Clark, Doc. 20-1 at 115).

**B.    Analysis**

**1.    *Whether Clark can establish prima facie intent to discriminate on basis of race***

The only *prima facie* element of this claim that is disputed is whether Clark was qualified for the asphalt foreman positions. Clark alleges that he was qualified because he worked on an asphalt crew at APAC for well over a decade and because he acted as temporary foreman for two or three weeks out of the year for the years 1999-2004. APAC disputes that Clark's experience establishes that he was qualified to be an asphalt foreman. Instead, APAC declares that Clark was not qualified because he

---

9.) Using the traffic control plan in the plans provided, how far should your flagman be placed beyond the flagman ahead sign?

10.) You will begin paving at Sta 8 + 51 and the end of the project is Sta 31 + 46. Lane width is 13 ft., mat thickness is 165# per square yard. How many tons would you order from the asphalt plant?

11.) Explain what problems in production occur when paving is stopped at the end of the day a very short distance from the end of a lane on a 2-lane highway, knowing that tomorrow you will need to turn around and pave the other lane.

[11/] Clark correctly answered questions 9 and 10. *See supra*, n. 10.

was unable to run the electronics on the APAC [paver] - a factor that Sam Head, the individual making the decision to fill the jobs, considered the single most important skill for the jobs.  ([Head, Doc 20-2 at] 7-8, 17).  Therefore, [Clark] cannot demonstrate that he was qualified for the job.  *See e.g.*, *Greer*, 291 Fed. Appx. at 945 (holding that plaintiff could not establish prima facie case of discrimination where plaintiff failed to meet minimum qualifications for job).

(Doc. 19 at 15-16).  Head testified that Clark was "not qualified" to be an asphalt foreman, explaining that "[t]he whole issue of qualification for a foreman is [to] be able to run electronics on a paver on DOT work or federal work.  That is the number one qualifying thing."  (Head, Doc. 20-2 at 17).

Clark never has denied he was unable to run the electronics on the paver and that doing so is necessary on DOT contracts.  He also does not deny that he only got two answers correct on the asphalt foreman test.  Nonetheless, Clark contends the posted asphalt foreman job description did not mention electronics as a duty and that APAC "did not dispute that he was qualified in" its October 2007 letter to him and the February and October 2008 responses to his EEOC charges.  (Doc. 27 at 28-29).  Each shall be examined in turn.

### a.    *The Asphalt Foreman Job Description*

**Asphalt Paving Supervisor/Foremen (construction)**: *Supervises and coordinates activities of workers engaged in spreading, rolling, and tamping asphalt or similar material to form surfaces of highways,*

*streets, parking lots, and aircraft landing strips*:  Calculates number of trucks required to haul asphalt from mix plant according to capacity of vehicles, traffic conditions, distance from work site, *and productivity of drivers*. *Tours work site to ascertain progress in meeting time schedules and to detect insufficient utilization of workers and equipment. Measures slope and thickness of paving to verify compliance with contract. Employee is responsible for complying with all company and governmental environmental, safety, and health policies and regulations.  May supervise workers engaged in patching asphalt paving* and be designated Supervisor, Patching (construction.) . . . .  Should employee be required to operate company vehicle, employee must meet the APAC, Inc. Driver Qualification Standards.  The job duties described herein are not exhaustive and may be supplemented.

(Doc. 20-8, Ex. 15)(emphasis added).

### b.    *The October 2007 letter from APAC to Clark*

On August 5, 2007, Clark sent a letter to APAC in which he complained, among other things, that he was not promoted to the 2007 asphalt foreman positions because of his race.  An internal investigation ensued and thereafter, on October 8, 2007, APAC sent Clark a letter expressing that it had found no evidence of discrimination in the promotion process.  (Doc. 28-1, Ex. 11 at 28-30).  Clark points to one sentence of that letter which reads, "As you are aware, the selection of foremen is based on several criteria, including experience running the type of machines that APAC uses." (*Id.* at 29).  The letter is signed by Dana Gortney, Human Resources Director, but was written by Heather Harper, APAC counsel.  (Gortney, Doc. 20-5 at 15-16).  Before the letter was written, Clark's complaints were addressed in an

individual interview with Heather Harper, APAC counsel, as witnessed by Dana Gortney. (*Id.* at 12). Gortney explained that the sentence pointed out by Clark referred to "electronics on our paver and screed that have to be operated when you're on certain jobs." (*Id.*).[12/] Clark admits that in 2007 he met with Gortney "once on the job site, [and once] at the Childersburg office." (Clark, Doc. 20-1 at 155). He also testified that he understood the Gortney letter was in response to the information he gave her or the office meeting. (*Id.*).

### c.   *APAC's responses to Clark's 2007 and 2008 EEOC charges*

On February 11, 2008, and October 29, 2008, APAC formally responded to Clark's December 2007 and February 2008 EEOC charges concerning the asphalt foreman promotions. The responses are essentially the same. (Doc. 28-1, Ex. 12 and 13). The Fall 2007 internal investigation was referenced, and APAC asserted that the

> Charging Party . . . alleges that he was not promoted because of his race and that "no reason was given for my non-selection." This is inaccurate. In fact, Charging Party was informed that the reason he was not chosen to fill the supervisory position[2] was his low score on a paving skills test given to applicants for this particular position and his qualifications and expected performance level relative to the other applicants.

---

[12/] Head also was interviewed as part of the investigation and told Gortney and Harper that Clark was not qualified because "[t]here were certain electronics that needed to be operated that he could not operate." (*Id.* at 20).

[2] This test contains questions about the road-building
process such as interpreting construction plans and
calculating efficiency rates for paving machines.

(Doc. 28-1, Ex. 12 at 33).

Even if these exhibits are construed in a light most favorable to Clark, the court cannot find that they create a disputed, much less undisputed, genuine issue of material fact that shows APAC did not consider electronics to be an important qualifier and that Clark was qualified for the asphalt foreman positions. Instead, when the job description and exhibit excerpts are examined in context, the documentation clearly shows that APAC desired a foreman who could ensure that his crew efficiently performed the tasks before it in compliance with government regulations and that Clark had not displayed the ability to do so during the testing process.

Reasonable inferences from these facts should be construed in Clark's favor. However, the inferences he desires the court to draw from these documents in an effort to establish the *prima facie* element at issue (qualification) are not reasonable. When the exhibits are considered in context and conjunction with Clark's knowledge of the industry (developed from 13 years of performing many skilled positions on an APAC asphalt crew), the inferences Clark desires the court to draw are even more unreasonable.  One cannot reasonably conclude that APAC did not consider

knowledge of electronics to be an important qualifier simply because the word electronics is not mentioned in the job description. Clark was made aware that he was not chosen because of his poor performance on the foreman exam and that APAC desired someone who could run the types of machines that company utilized. Clark is aware that use of electronics on DOT contracts is required. Common sense dictates that a paving company would desire DOT work and therefore would be eager to have an asphalt foreman who could ensure his crew performed well on federally-funded paving projects. The reasonable inference from this information is that APAC believed Clark was not qualified and told him so.

The only evidence Clark can rely upon to establish that he was qualified to be Asphalt Foreman is 13 years of experience with asphalt and acting as temporary foreman for two or three weeks out of the year between 1999 and 2004. Considering the required qualifications for the asphalt foreman position, this court finds that Clark's personal belief in his own experience to show that he was qualified is insufficient to establish a presumptive intent to discriminate.

### 2.    *Whether APAC has produced legitimate non-discriminatory reasons for its hiring decisions*

Even assuming *arguendo* that Clark's lengthy experience with asphalt and tenures as temporary foreman meet his initial burden to establish the *prima facie*

elements of his failure to promote claims, APAC has produced legitimate, non-discriminatory reasons for its hiring decisions. (Doc. 19 at 18-19). As stated earlier, this burden of production is exceedingly light. Sam Head, then Area Manager, was the sole decision-maker in the hiring process for the two Asphalt Foreman positions. Head considered David Wright and Chris Waldrep "to be the best qualified [candidates for the jobs] based on their test scores and experience and ability to run the electronics on the APAC vehicles and Head did not consider plaintiff qualified for the job because of his test score and his inability to run electronics." (*Id.* at 18) (citations omitted).

### 3.   *Whether Clark has met his burden of persuasion to show that APAC's stated reasons are pretext to discriminate*

Clark argues that "there is ample evidence from which a jury could find that the articulated reason for non-selection is pretextual." (Doc. 27 at 28-32). The court divides this evidence into logical categories for disposition purposes.

### a.   *Documentary evidence*

The first category is comprised of the three exhibits Clark pointed to in support of his *prima facie* case. (*Id.* at 29-30). However, for the reasons already discussed, *supra*, the documents are not inconsistent with APAC's position or Head's stated

reasons simply because the precise words "electronics" and "not qualified" do not appear therein.

>    **b.**     ***Inconsistencies in Head's testimony and the asphalt foreman test***

Second, Clark points to inconsistencies in Head's testimony with regard to the reason he developed the asphalt foreman test.  Head continually testified that running paver electronics on DOT work or federal work was the most important qualifier for asphalt foreman positions that were open in 2005 and 2007.  (*Id.* (citing Head, Doc. 20-2 at 17-18 & 24)).  According to Clark, Head touted this importance as the reason he gave a written test for the 2007 positions.  (*Id.* at 24).  Yet, despite the same asserted importance when an asphalt position was open in 2005, Head did not administer a test to then applicant Scott Rich (white).  (*Id.*).

APAC declares that the evidence does not reveal the inconsistency Clark alleges.  (Doc. 30 at 8).  Examination of the testimony cited by Clark shows that APAC is correct.  After testifying that the most important qualifier in 2005[13] and

_____

[13] Clark points the court to the 2005 EEOC investigator's interview notes with Head to bolster his contention that electronics was not mentioned by Head at that time.  (Doc. 30 (citing *id.*, 36-1 under seal).  The court questions the admissibility of the notes, but in any event the notes show that Head purportedly told the investigator that he hired David Smith for an open asphalt foreman position in 2005 because Smith had been a foreman with an APAC competitor and Smith had experience working on "federally funded projects, more requirements."  (*Id.*).  It is obvious from the facts and evidence discussed in the body of the Memorandum to this point that references to federal-funded requirements and regulations boil down in practical terms to an understanding of electronics on the

2007 was knowledge of electronics and specifications, Head was directly asked why

he chose to administer a test in 2007 when he had not in 2005.  Head answered,

> The difference [in 2007] was the type of work we had
> going on, and it absolutely required somebody to be able to
> run electronics very well and know specifications.
> Because of the changes specification-wise, penalty-wise
> with the DOT, that was the reason.  I thought that was the
> best way to ensure that we had the best candidate.

(Head, Doc. 20-2 at 24).  That Head wanted an asphalt foreman who could comply

with DOT specifications and avoid penalties is a legitimate non-discriminatory reason

to create a test to discern the best candidate for the asphalt foreman position.  Clark

does not deny that there is a valid and important connection between DOT

specifications and penalties and the use of paver electronics on DOT asphalt jobs.

Nor does he deny that DOT regulations and penalties became more strict around the

time period at issue.  Clark has failed to establish any inconsistency in APAC's

position because Head implemented an asphalt foreman test in 2007 when he did not

in 2005.

### c.    *Statements from Supervisors about Head and Race*

Clark argues that two supervisors made comments that led him to believe he

would not be and was not promoted because he is black.  APAC argues that these

---

screed/paver to comply with DOT contracts.  Therefore, even if the content of the 2005 interview
notes is admissible, the notes are actually consistent with Head's present testimony.

statements are "unsubstantiated hearsay"[14] from "individuals who had no involvement in the actual promotion decisions" and thus are nothing more than stray remarks. (Doc. 30 at 8). Clark counters that these are "admissible statements against interest" because the statements were made by supervisors. (Doc. 27 at 30). Thus, Clark is arguing the statements are not defined as hearsay under Federal Rule of Evidence 801(d)(2)(D). That rule instructs that when "an opposing party's statement is offered against that party *and* the statement was made by the party's agent or employee on a matter within the scope of that relationship and while it existed," such a statement is not hearsay. (*Id.*). Therefore, to the extent the admissibility of Clark's proffered statements turn on the application of 801(d)(2)(D), the nature and timing of the supervisory positions is a determining factor.

Clark alleges that in 2005 Assistant Asphalt Foreman Dennis Jackson stated that Clark would not be promoted to asphalt foreman because of the color of his skin. Although Jackson is referred to as an assistant foreman, Clark testified that Jackson actually was not in any management position, but was a co-worker Clark talked with after work hours. (Clark, Doc. 20-1 at 112). The statement also is not based on any personal knowledge, and Clark has not proffered an affidavit or testimony from

---

[14] Pursuant to Rule 801(c) of the Federal Rules of Evidence, "'Hearsay' means a statement that (1) the declarant does not make while testifying at the current trial or hearing, and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."

Jackson.  Clark has not established that the statement is non-hearsay as defined by Federal Rule of Evidence 801(d)(2)(D).  For such a statement to be considered a statement against interest by a part opponent, the supervisor must be speaking of "a matter within the scope of [their] employment or agency."  *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F. 3d 548, 562 (11th Cir. 1998).  There is no evidence to establish that a comment made by a co-worker in 2005 rendered him knowledgeable about or a decision-maker involved in the hiring of an asphalt foreman in 2007.  For all of the foregoing reasons, Clark cannot establish that Jackson's statement could ever be admissible at trial.  It is rank hearsay and the content of it, made by a co-worker two years before Clark applied for the asphalt foreman positions, is nothing more than stray gossip.

Clark also alleges that in Fall 2007 his new supervisor, Asphalt Foreman David Wright, told Clark that Head didn't hire Clark because he was black.  (Clark, Doc. 20-1 at 47-48, 112-13).  The court finds that even though Wright was Clark's supervisor at the time the statement was made, Wright could not have been speaking on a matter that was within the scope of his agency or employment.  Wright was nothing more than Clark's co-worker and competitor for the Asphalt Foreman positions in June and July 2007.  Regardless of timing, the undisputed evidence shows that only Head, as an Area Manager, had the authority to direct the manner in

which the Asphalt Foreman hiring process was carried out and he alone decided who was hired for those positions in June and July 2007.  The content of Wright's statement does not show that it was based on personal knowledge or anything he heard about or from Head.  Wright denied ever making such a statement in his deposition.  Again, the statement Clark attributes to Wright is hearsay which cannot be reduced to admissible form at trial and therefore cannot be considered as evidence.

        **d.**    *Head never hired an African-American for a management position*

Clark alleges a fact-finder could determine that Head's reasons are a pretext for race discrimination because Head never promoted an African-American to a management position in his 15 years with APAC.  (Doc. 27 at 30 (citing Head, Doc. 20-2 at 78)).  But "'for this fact to be relevant,'" a plaintiff has "'to present evidence that blacks applied and were rejected and evidence of the success rate of equally qualified white applicants.'"  *Evans v. McClain of Georgia, Inc*., 131 F.3d 957, 963 (11th Cir. 1997) (quoting *Howard v. B.P. Oil Co., Inc.*, 32 F.3d 520, 524 (11th Cir. 1994)).  Clark has not done so, and as such this contention is irrelevant.

        **e.**    *Other*

           **i.**    *Statements by supervisors about Head and retaliation*

          **ii.**    *Demonstrations of lack of credibility regarding other matters*

The remaining evidence proffered to show that Head's reasons for non-promotion are pretext involve Head's general credibility.  First, Clark declares that supervisors told him in 2005 and in the Fall of 2007 that Head wanted to get rid of him or get back at him.  (Doc. 27 at 30 (citing Clark, Doc. 20-1 at 38-39, 52, 183-84 and 188-89)).[15/]  Clark also points to other inconsistencies in Head's testimony about other subjects to show Head is, in general, not credible.  For instance, Clark points to a "retaliatory transfer and demotion which was not for training."  (*Id.* at 30).  Clark declares Head's

---

[15/]  Clark again argues that Rule 801(d)(2)(D) is the basis for admission of the statements of these "supervisors."  The court finds that all occurred in 2005, more than two years before the 2007 asphalt foreman promotions.  For instance, Clark alleges that in 2005 then Asphalt Foreman Dannie McKibbon and Assistant Foreman (co-worker) Dennis Jackson told Clark that Head transferred Clark to McKibbon's crew to get rid of him.  (Doc. 27 at 30 (citing Clark, Doc. 20-1 at 38-39)).  McKibbon denied ever discussing the reason for Clark's transfer with Head or making such a statement.  (McKibbon, Doc. 20-6 at 18-20).  Jackson was a co-worker, and no testimony from him has been submitted.  Also in 2005, Clark contends Asphalt Foreman Scott Rich told Clark that Head had stated to Rich that he was going to get back at Clark for Clark's 2005 complaints.  (Doc. 27 at 30 (citing Clark, Doc. 20-1 at 38-39 at 188-89)).  However, no testimony from Rich is submitted.  In 2007, Clark alleges that his Asphalt Foreman David Wright told him that Head wanted to get rid of Clark but that Wright would help him.  (*Id.* (citing *id.* at 52)).  Finally, Clark asserts that Robert Taylor told him Head had called Taylor (who had been a prior APAC employee) a month or two prior to Clark's 2008 termination and told Taylor that APAC was "going to bring him back to learn how to do the Distributor." (*Id.*, (citing *id.* at 184)).  No testimony from Taylor is submitted.  With the exception of Rich and Taylor, it is uncertain that any of the statements are even based on the personal knowledge of the declarant.  Finally, the purported statements by Rich and Taylor constitute inadmissible double-hearsay.  "Under the federal rules, '[h]earsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules.'"  *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1456-1457 (11th Cir. 1997) (quoting Fed. R. Evid. 805; *see U.S. v. Pendas-Martinez*, 845 F.2d 938, 942-43 (11th Cir.1988) (both levels of hearsay must be excepted from the hearsay rule)).

> claims that he transferred Plaintiff [to another asphalt crew
> in 2005] so that he could receive training are completely
> refuted by the defendant's own supervisor who disavowed
> any knowledge of the plan to train plaintiff in electronics
> coupled with the retaliatory movement to laborer and to
> working with someone who had made allegations of sexual
> harassment against the plaintiff all cas[t] doubt on his
> credibility.

(*Id.* at 30-31).[16]

---

[16] Clark provides no citation to the parties' Statement of Facts or the record to support this run-on sentence. Nonetheless, it is undisputed that Dannie McKibbon was Clark's asphalt foreman from the time Clark was transferred to McKibbon's crew in the latter half of 2005 until about July 2007 when McKibbon temporarily left the company and David Wright was promoted to McKibbon's position. Clark contends that his 2005 transfer to McKibbon's crew was "retaliatory" because it was a demotion to laborer that occurred "two weeks after" he complained to Connie Wiggins, an APAC Human Resources employee, about not being promoted to an asphalt foreman position. (Doc. 27 ¶ 14 at 15 (citing Clark, Doc. 20-1 at 122-23 & 190)). Yet, Clark admits that his pay was never reduced, that he only performed laborer duties for a temporary period, and "most of the time" he remained a distributor operator. (Clark, Doc. 20-1 at 27, 190). Neither these conditions nor the discomfort Clark felt by working with a woman who previously had accused him of sexual harassment rise to the level of adverse employment conditions.

Clark also asserts that the transfer was retaliatory because Area Manager Sam Head testified that Clark's transfer was instituted due to Clark's obvious interest in becoming an asphalt foreman, that there was no one available on Clark's old crew who could train Clark on electronics, and that there was an asphalt crew member on McKibbon's crew (namely, screed operator David Wright) who could teach Clark electronics. (Head, Doc. 20-2 at 42-43). Head testified that he instructed McKibbon regarding this matter (*id.,*) but McKibbon testified, "I can't remember exactly [anyone instructing me to specifically train Clark]. I would be lying if I said yes. But when he comes over, he's supposed – everybody is supposed to get trained on the back of that spreader for them electronics. Everybody." (McKibbon, Doc. 20-6 at 19-20). Clark testified that he never was told that he was being put on McKibbon's crew to get "additional training" that would help him get an asphalt foreman job. (Clark, Doc. 20-1 at 123-24). Instead, Clark asserts that his then Superintendent Brett Thornton told him that he was needed on McKibbon's crew. (*Id.* at 123). Curiously, Clark's 2005 EEOC file contains several pieces of information that may not be admissible but certainly reflect a different story than the one Clark submits in his pleadings and testified to under oath. (Doc. 37-1 at 21-25 (under seal)). Specifically, the EEOC investigator's interview notes with Clark on November 15, 2005, show that Clark described himself as a distributor operator and a screed operator. Moreover, Clark displayed an understanding of the skills required for both positions by explaining that a screed operator controls the depth and width of asphalt and the

Next, Clark points out that Head claimed that he had nothing to do with the

decision to terminate Clark [in February 2008], but that APAC's interrogatory

responses and Asphalt Superintendent David Smith's testimony[17] "cast doubt on

[Head's] credibility."  (*Id.* at 31).

None of this proffered information in this subsection is material to the claim

being analyzed because the *content* of the information would not establish that the

_____

distributor operator sprays tar on existing asphalt prior to putting down new asphalt.  Clark alleged
he was being retaliated against for complaining about not being promoted to an asphalt foreman
position.  This retaliation was in the form of transfer to McKibbon's crew.  *Clark admitted that he
had spoken to his new Superintendent Brett Thornton about it and Thornton informed Clark the
position was temporary "and to learn how to operate the screed machine."*  (*Id.* at 24) (emphasis
added).

In any event, despite McKibbon's testimony that he could not state Head told him to provide
Clark additional training, McKibbon also undisputedly testified that on his crew, "[W]e all train.
Everybody trains everybody, and everybody wants to move up. . . .  [W]hen you come over there,
you're going to train.  I mean, every day is training."  (McKibbon, Doc. 20-6 at 19-20).  Clark has
not stated a claim (*see* Section II.C, *supra*.), nor has he alleged or presented any evidence that Sam
Head, Brett Thornton, Dannie McKibbon, David Wright or any other member of the McKibbon
asphalt crew member chose not to or refused to train him on electronics.  Significantly however,
when Clark was asked if he had learned anything new to him while under McKibbon's crew, Clark
answered, "No, sir."  (Clark, Doc. 20-5 at 190).

The record establishes that Clark did not suffer any real adverse employment conditions due
to the alleged retaliatory transfer even though he did show a temporal proximity between the internal
complaint and the institution of the event.  Further, although there are discrepancies between Head
and McKibbon's testimony about why Clark was transferred, Clark admitted his Asphalt
Superintendent told him his transfer was due to need.  Regardless, none of the  testimony can alter
the fact that Clark's lateral transfer simply did not result in adverse employment conditions.  *Davis
v. Town of Lake Park, Fla.,*  245 F.3d 1232, 1239 (11 th Cir. 2001) (To prove adverse employment
action "an employee must show a *serious* and *material* change in the terms, conditions, or privileges
of employment.").  In short, there was no retaliatory transfer, a conclusion also drawn by the EEOC
after its investigation of Clark's complaints.  (Doc. 20-1 at 95).

[17]  The facts surrounding this purported credibility question are addressed in detail in Section IV.
B. 1, *infra*.

decision not to promote Clark was a pretext for *race discrimination*.  In other words, Clark's burden is to establish race discrimination was the reason for his non-selection. That cannot be established by presenting evidence that Head wanted to get back at or get rid of him for complaints he made two years earlier.  Nor would Clark's assertions that Head has demonstrated inconsistent positions in connection with a 2005 transfer to another crew and that Head and APAC have been inconsistent about who was decision-maker in Clark's termination in February 2008.  In short, none of this other evidence effectively rebuts head-on the reasons APAC declares  that Clark was not promoted for the 2007 asphalt foreman positions.

Even if this other evidence could be considered to have some relevance in the pretext arena of this race discrimination claim, no reasonable juror would be moved to disbelieve APAC's proffered reasons for Clark's non-promotion based on it. Clark's admission that he cannot operate the screed electronically necessarily demonstrates that he cannot supervise and ensure someone else's proper use of it. Moreover, Clark performed very poorly on the asphalt foreman test, a test which clearly tested a range of skills expressly listed in the posted job description.

**C.**   **Conclusion**

For all of the foregoing reasons, Clark has failed to meet his burden of persuasion with regard to his failure-to-promote claims.  The defendant has proffered

legitimate non-discriminatory reasons for Clark's non-selection, and Clark has not met his burden to show that those reasons were a pretext for race discrimination. That Clark believes that his lengthy experience at APAC and brief stints as temporary foreman rendered him as qualified or more qualified for the positions is irrelevant under the circumstances because the defendant has offered legitimate business reasons for the decision it made. Clark "cannot prove pretext by asserting baldly that []he was better qualified than the person at issue." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1090 (11th Cir. 2004) (citing *Alexander v. Fulton County*, 207 F.3d 1303, 1339 (11th Cir. 2000)). Clark has produced no evidence to show "'disparities in qualifications [between himself, Wright, and Waldrep that are] of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen [Wright and Waldrep] over the plaintiff for the job in question.'" *Woodard v. Fanboy, L.L.C.*, 298 F.3d 1261, 1266 (11th Cir. 2002) (quoting *Alexander*, 207 F.3d at 1340)) (brackets added).

Accordingly, APAC's motion for summary judgment as to Count I of Clark's complaint is due to be and is due to be **GRANTED** and the claim **DISMISSED WITH PREJUDICE**.

## IV.  COUNT II

## **Retaliatory Discipline and Termination**

In the burden-shifting analysis applicable to this claim, Clark bears the initial burden of establishing a *prima facie* case of retaliation by showing that (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action; and (3) there was a causal link between his protected activity and the adverse action. See *Davis v. Coca Cola Bottling Company Consolidated*, 516 F.3d 955, 978 (11th Cir. 2008); *Goldsmith v. Bagby Elevator Company*, 513 F.3d 1261, 1277 (11th Cir. 2008); *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007).

> The third element requires a plaintiff to demonstrate that "the decision- maker[s] [were] aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) (alterations in original) (quotations omitted); *see also Griffin v. GTE Fla., Inc.*, 182 F.3d 1279, 1284 (11th Cir. 1999) ("At a minimum, [a plaintiff] must show that the adverse act followed the protected conduct; this minimum proof stems from the important requirement that the employer was actually aware of the protected expression at the time it took adverse employment action.") (quotations omitted). We have found that " 'close temporal proximity' may be sufficient to show that the protected activity and the adverse action were not 'wholly unrelated.' " *Gupta*, 212 F.3d at 590 (quoting *Farley v. Nationwide Mut. Ins.* Co., 197 F.3d 1322, 1337 (11th Cir. 1999)).

*McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008). If the plaintiff establishes

his *prima facie* case, then

> the burden of production shifts to the defendant to rebut the
> presumption by articulating a legitimate, non-
> discriminatory reason for the adverse employment action.
> If the defendant carries this burden of production, the
> presumption raised by the prima facie case is rebutted and
> drops from the case. After the defendant makes this
> showing, the plaintiff has a full and fair opportunity to
> demonstrate that the defendant's proffered reason was
> merely a pretext to mask discriminatory actions.

*Brown v. Alabama Dept. of Transp.,* 597 F.3d 1160, 1181 (11th Cir. 2010) (quoting

*Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009) (omitting internal citations and

quotation marks)).

## A.     The February 1, 2008, Disciplinary

Clark alleges that once he "filed EEOC charges [on December 14, 2007,]

alleging discrimination in [the 2007] promotions, he began to be reprimanded." (Doc.

1 at 3, ¶ 10). Specifically, on February 1, 2008, he "was given [a] written reprimand

and placed on a six-month probationary period." (*Id.* at 3, 5, ¶¶ 10, 21-22) (brackets

added). Clark claims that APAC's "reason for its action[] is pretext for retaliation."

(*Id.* at 6, ¶ 23).

APAC does not deny Clark participated in protected activity when he filed his

December 14, 2007, EEOC charge nor does APAC deny that Clark suffered an

adverse employment action when he was found to be at fault for and placed on six months probation for a work accident.  APAC does assert that Clark cannot establish a *prima facie* case of retaliation with "respect to the December 2007 discipline because the decision maker was unaware of [Clark's] complaints."  (Doc. 18 at 3, ¶ 9); (Doc. 19 at 23-24).  Alternately, APAC declares that Clark cannot "produce evidence sufficient to permit a reasonable fact finder to disbelieve [it]'s proffered legitimate, nonretaliatory reasons" for Clark's discipline because Clark admitted that he violated the company policy by "backing up an APAC vehicle." (Doc. 18 at ¶¶ 10); (Doc. 19 at 23).

1.     *Facts*

The following facts are undisputed, or if disputed, Clark's version of events is credited.  All reasonable inferences are drawn in favor of Clark.  On November 8, 2007, Clark was involved in an on-site collision with another APAC vehicle.  On December 14, 2007, Clark filed an EEOC charge.  On December 21, 2007, Anthony Nicholson, Area Safety Director, signed a written reprimand.  (*See* Doc. 20-1 at 72).  Asphalt Foreman David Wright also signed as Clark's supervisor.  Nicholson listed "carelessness" and "backing accident" as the nature of Clark's violation and found that Clark "collided with another APAC vehicle while backing [the] tack-truck on [the] job site."  (*Id.*).  Nicholson found Clark to be at fault for the accident and placed

Clark on six months' probation, which would take effect upon Clark's receipt of the reprimand.

Clark received the written reprimand on February 1, 2008, and disputed that the accident was his fault, writing, "I FEEL THAT I WAS NOT AT FAULT IN ANY WAY." The road was <u>closed</u> with a flagger. If the other employee would have simply with [(sic)] around, blew his horn. We wont [(sic)] be discussing this. How could I be at fault when backing is part of the daily routine while tacking?" (*Id.*) (brackets added).

**2.   *Analysis - Whether Clark can satisfy his presumptive burden and burden of persuasion to establish retaliation***

APAC argues that Clark cannot establish a causal connection between any protected activity (*i.e.* Clark's Fall 2007 internal complaint or the December 14, 2007, EEOC charge) and the reprimand because the decision-maker, APAC Area Safety Director Anthony Nicholson, "was unaware of the alleged protected activity and as such, was incapable of retaliating against" Clark. (Doc. 19 at 24). In his declaration, Nicholson attests,

> I was employed with APAC Mid-South, Inc. ("APAC") as its Area Safety Director from 2002 to 2009. I had responsibility for safety matters, including accident investigations, for a large portion of the state of Alabama, including Birmingham, Oxford, Anniston, Montgomery, and surrounding areas.

During my employment with APAC, I recall investigating an accident involving Jeffery Clark which occurred on November 8, 2007. Following the accident, I conducted an investigation that took approximately five weeks and determined that Mr. Clark was at fault in the November 8, 2007 accident.

On December 21, 2007, I prepared and signed an Employee Warning Record for Mr. Clark. During my employment with APAC, including when I prepared and signed the Employee Warning Record, I had no knowledge that Mr. Clark had filed an EEOC charge alleging discrimination or had ever made any complaints alleging that he had been discriminated against on the basis of his race.

David Wright did not assist in the investigation of Mr. Clark's accident, and did not influence or participate in the decision to discipline Mr. Clark. Mr. Wright signed the Employee Warning Record as a matter of standard practice because he was Mr. Clark's immediate supervisor.

Because my position required me to travel to different areas of the state and the fact that Mr. Clark's crew also moved, I did not see Mr. Clark until February 1, 2008, and was therefore not able to issue the disciplinary action contained in the Employee Warning Notice prior to February 1, 2008.

(Nicholson, Doc. 20-9) (brackets added).

To the extent he addresses this claim in his opposition argument, Clark makes

the following declaration: "the retaliatory probation for an accident that occurred two

months earlier after an internal investigation of plaintiff's complaints of

discrimination coupled with the outright lie of no knowledge of plaintiff's racial complaints is more than adequate to support a finding of retaliation." (Doc. 27 at 34). Clark does not follow this conclusory declaration with any citations.  The best this court can determine from this sentence, when compared to Clark's responses to APAC's Statement of Facts on the subject, is that Nicholson's declared lack of knowledge of his discriminatory complaints and EEOC charges are not credible. (Doc. 27 at 9, ¶¶  31-33).  The facts that can be gleaned from the cross-comparison are organized into three categories.

### a.    *The knowledge of other employees*

Clark points to the testimony of David Smith and David Wright, who agreed[18] Clark's racial discrimination complaints were common knowledge at APAC.  (*Id.* at ¶ 31).  Still, Smith and Wright were Clark's daily co-workers/supervisors at APAC's Construction Department, Anniston Branch.  Clark does not dispute that as Area Safety Director of APAC's Safety Department, Nicholson was not at the Anniston Branch on a daily basis nor was he co-worker or supervisor to Clark on the road construction side of APAC Anniston/Childersburg.  Smith and Wright's knowledge cannot be imputed to Nicholson. *See Brochu v. City of Riviera Beach*, 304 F.2d 1144,

---

[18]  (Smith, Doc. 20-3 at 51); (Wright, Doc. 20-4 at 42).

1156 (11th Cir. 2002) ("neither a court nor a jury may impute knowledge to a decision-maker who has sworn he had no actual knowledge").

      **b.**    ***A 2005 telephone complaint to HR and the August-October 2007 internal investigation***

Also lacking is Clark's assertion that Nicholson's declaration contains an outright lie based on the fact that Nicholson personally was called to address a 2005 internal complaint by Clark about the "discriminatory punishment" Clark received in connection with a 2004 work accident. (Doc. 27 at 9, ¶ 31). Clark points to an HR notation written by APAC EEO Officer Charlene Robinson as evidence in support of his contention. (Doc. 28-1, Ex. 1, at 2-3). In it, Robinson expressed that Clark

> told me that he had another problem that he needed to discuss. He said when he had his accident last year, he was suspended from work by our safety manager, Tony Nicholson. He said that lots of others had had accidents since that time (he mentioned Debra Pogue and Lee Stanley) and said that they had not been suspended. He didn't think it was fair and that if they weren't going to suspend them, he wanted his 3 days back. I told him that I was not safety and could not speak for them but would be happy to contact them and ask them to give him an answer as to why he was suspended and others weren't.
>
> When I hung up from talking to Mr. Clark I called Mary Day, Division Safety Manager and told her about the call. She said each accident was different and handled differently. Mary said for me to call Tony Nicholson, our area Safety Manager and have him go to the job site and meet with Mr. Clark and explain why he was suspended

> and why others mentioned weren't.  I called Tony and he
> said that he would go and talk to Mr. Clark.

(Doc. 28-1, Ex. 1, at 2-3).

The notation does not reveal that Clark believed he was unfairly punished on the basis of race nor does Clark present any other evidence to support his conclusory assertion that the complaint was about discriminatory punishment.  In fact, Clark's deposition reveals that Lee Stanley[19] is African-American.  (Clark, Doc. 20-1 at 63). For the foregoing reasons, even when the HR notation is construed in a light most favorable to Clark, it shows only that Nicholson may have been asked to address what Clark believed to be unfair punishment for a certain degree of infraction – not unfair punishment because of race.  As such, the 2005 HR notation cannot be offered as evidence to dispute Nicholson's declaration that he was unaware Clark had made *discrimination* complaints.

Next, Clark points blankly to the August/October 2007 internal investigation to show that Nicholson's lack of knowledge about his discrimination complaints is a lie.  However, Clark presents no evidence whatsoever to show how Nicholson, as Area Safety Director, was made privy to this matter.

---

[19] Debra Pogue was not mentioned.

### c.   The delay between the November 8, 2007, accident and Clark's February 8, 2008, receipt of the infraction

Clark alleges that waiting six weeks to make a fault and punishment determination (on December 21, 2007,) and another six weeks to give it to him (February 1, 2008,) for the reasons stated by Nicholson are simply not credible.  (Doc. 27 at 9, ¶ 32).  However, Clark himself recognizes that APAC has represented[20] that the EEOC's request for a response to Clark's December 14, 2007, charge only was placed in the mail to APAC on December 21, 2007, the same day Nicholson signed the reprimand.  (*Id.*).  Therefore, Nicholson's knowledge of the EEOC charge is chronologically impossible.  Still, Clark believes that suspicion as to Nicholson's knowledge is not alleviated because he was not given the warning and punishment until February 1, 2008, several weeks after Nicholson signed it.  (Doc. 28-1, Ex 12-13 at 31-37).  In other words, Clark asks the court to find that he has established a *prima facie* retaliation claim based solely on the premise that the delay preceding his receipt of the disciplinary infraction must be considered inherently suspicious, *ergo* Nicholson knew about Clark's protected activities.

---

[20] Clark neither denies nor disputes the validity of APAC's assertion.

### 3.    *Conclusions*

Inherent suspicion is insufficient to create a genuine issue of fact to dispute Nicholson's attested lack of knowledge as to Clark's discrimination complaints. Even if this court were to assume *arguendo* that the delay meets Clark's burden to establish a presumptive intent to retaliate, it certainly would not convince a reasonable factfinder that APAC's legitimate non-retaliatory reason for the adverse employment decision and delay were a pretext for retaliation.  The content of the written warning itself and Nicholson's affidavit show that as the APAC Safety Director, Nicholson investigated the collision and determined that Clark was at fault – not simply because he admittedly was backing up the tack truck as argued by APAC – but because he was careless while doing so.[21]

Carelessly causing an on-site accident is a legitimate non-discriminatory reason for a warning and punishment.  Clearly, Clark believes that Nicholson made the wrong decision when he found Clark was at fault.  But Clark cannot establish pretext "'by simply quarreling with the wisdom of'" Nicholson's decision, "'no matter how

---

[21] As noted earlier, defendant APAC argues that Nicholson's testimony and Clark's admission that he was backing at the time the accident occurred proves Clark violated a policy against backing. Clark correctly counters that APAC's argument is not accurate.  (Doc. 27 at 8).  The warning and Clark's testimony (Clark, Doc. 20-1 at 134-35, 150) only show that Clark admitted he was backing up when the accident happened, not that it was against company policy to do so.  Moreover, neither the warning nor Nicholson's affidavit make clear that "backing" in and of itself is a violation of company policy.

mistaken'" he believes it to be.  *Alvarez v. Royal Atlantic Developers, Inc.,*  610 F.3d 1253, 1265-66 (11th Cir. 2010) (citing *Chapman,* 229 F.3d at 1030).

For all of the foregoing reasons, defendant APAC's motion for summary judgment as to this claim is due to be **GRANTED** and the claim **DISMISSED WITH PREJUDICE**.

### B.    The February 8, 2008, Termination

Clark next claims that after he filed the December 14, 2007, EEOC failure-to-promote charges, he suffered retaliation in the form of a "written reprimand for allege[dly] sleeping on the job and insubordination . . . and [was] terminated on February 8, 2008." (Doc. 1 at 3 & 5,  ¶¶ 10, 21-22).  He claims that APAC's "reason for its action[] is pretext for retaliation."  (*Id.* at 6, ¶ 23).

#### 1.    *Facts*

The following facts are undisputed or, if disputed, taken in a light most favorable to Clark in analysis.  All reasonable inferences will be afforded to Clark. On January 10, 2008, Clark's Asphalt Foreman David Wright yelled at Clark and told him to get his "big, black, bald ass" out of the tack truck.  This was not first time Wright had been racially offensive.  In the Fall 2007, Clark also had difficulty with Wright because Wright would play rap music containing the offensive word "n----r" in it, and brushed off Clark when Clark complained about it.  (Clark, Doc. 20-1 at

68-69).   Wright contends that he told Superintendent David Smith about the rap music as well, but Smith denies Clark ever told him about it.  (Smith, Doc. 20-4 at 50).

In any event, on January 10, 2008, Wright attempted to issue Clark a reprimand for insubordination.  Clark informed Asphalt Superintendent David Smith about Wright's racial slur used on that date.  After considering the matter, Superintendent Smith refused Wright's reprimand against Clark and instead reprimanded Wright for speaking to Clark in such a manner.  Smith punished Wright with a three-day suspension.  (Smith, Doc. 20-3 at 27-28 ); (Wright, Doc. 20-4 at 15, 41-42).  APAC has produced no written record of the reprimand against Wright.  Clark testified that Wright took his three-day suspension about two weeks prior to February 8, 2008.  (Clark, Doc. 20-1 at 183-84).  Wright denied that he used the word black when yelling at Clark, but chose to go ahead and accept the infraction because he didn't want to deal with it.  (Wright, Doc. 20-5 at 12-13, 14-15).  Wright stated he was mad about the situation only for about a day.  (*Id.* at 34).

On February 8, 2008, Clark was informed that he had been accused of sleeping in his truck and being insubordinate during the previous workday.  Clark testified that

> [Asphalt Superintendent] David Smith called me in the office, Ray Doss was present.  Ray Doss was an Estimator at the time, and he said I had a complaint, that I

> was sleeping in the truck.  And I told him I that I was not
> sleeping in the truck.  He told me that I also was told to
> report back to the spreader after - - after the tacking, which
> I did every time and kind of went back and forth; that, you
> know, he had a witness.  He wouldn't name the witness,
> but he did say he had a witness that I was asleep. . . . And
> after telling him repeatedly that I was not asleep, he
> showed me the write-up, I read it, and I asked the question,
> I said are you saying that I'm no longer employed here, he
> said yes.

(Clark, Doc. 20-1 at 78).

At his deposition, David Wright admitted he was the one who wrote Clark up

for insubordination and sleeping in the truck.  (Doc. 20-4 at 16).  Wright made no

recommendations about the matter and, as far as chain of command for termination,

David Smith was the only supervisor of which Wright was aware.  (*Id.* at 26 ("Once

it goes out of my hands, it's somebody else's problem.")).  Wright's explanation for

the write-up included the comment, "When you're shorthanded on a paving crew,

after you've been there twelve years, you would know to come back and help the

crew after you tack up instead of sitting in the tack truck and going to sleep." (*Id.* at

38).

Wright's testimony is confirmed in the February 8, 2008, write-up that Clark

was given.  In it, David Smith wrote, "David Wright & witness Todd County

Inspector[22] reported to me that Jeff Clark was asleep in the tac (sic) truck while truck was running[.] He was told several times to report back to pave due to short handed." (Doc. 28-1, Ex. 20 at 60). Smith listed the nature of Clark's violation as "safety," "uncooperative," and "sleeping on job." (*Id.*). The record also shows that Clark had been warned previously. (*Id.*). Smith wrote that Clark was terminated for a safety hazard in that he "was seen by David Wright . . . asleep while equipment was running[. Clark's] foot or hand could have slipped" and caused an environmental catastrophe. (*Id.*). Smith also wrote that Clark was terminated because he was insubordinate in that he did not do what he was told.

At his deposition, Smith testified that from what he could remember, Clark was terminated for sleeping on the job and reiterated the safety concerns about the tack truck running. (Smith, Doc. 20-3 at 53, 55-56). Smith did not consider it important that David Wright had just been suspended for speaking to Clark in a racially offensive manner when making his decision to terminate Clark based on Wright's

---

[22] Clark declares that any statement from Todd is hearsay from a non-employee and such is not admissible. (Doc. 27, ¶ 42 at 11). Clark is incorrect. Pursuant to Rule 801(c) of the Federal Rules of Evidence, "'Hearsay' means a statement that (1) the declarant does not make while testifying at the current trial or hearing, and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." However, what Inspector Todd told David Smith is not being offered to prove the truth of the matter being asserted in the statement, *i.e.*, it is not being offered as proof that Clark was indeed sleeping in the car. Instead, it is "offered to demonstrate [Smith's] state of mind regarding whether he believed" Clark had committed the infraction. *U.S. v. Schlei*, 122 F.3d 944, 981 (11th Cir. 1997). Therefore, Smith's testimony as to what Inspector Todd told him is not hearsay.

report.  (*Id.* at 58).  Smith personally spoke with Mr. Todd, who told Smith "he was in the truck with David Wright when they went by, [and] that [Clark] was asleep in the truck."  (Smith. Doc. 20-4 at 58).  Smith asserted that the employee handbook[23] stated it was a violation of company policy to sleep on the job.  (*Id.* at 57).

Clark does not deny that sleeping is a rule violation, but declares that it was common for employees to sleep on the job, and in any event he was not sleeping in his truck on February 7, 2008.  (Clark, Doc. 20-1 at 89-91) ("Every employee that works on the asphalt crews sleeps on the job when we do not have asphalt or when things are slow.").  Dannie McKibbon, Clark's asphalt foreman between 2005 and 2007 and a 25-year veteran employee at APAC testified,

> If we're waiting on asphalt or if we're going to continue on, let's say we worked all day and we're working into the night and we're waiting on asphalt, everybody is going to try to rest a little bit.
>
> . . . . .
>
> Most of them are going to try to rest some, and they are going to sit in the truck.  I'm not going to say they are all going to sleep, but they might sit in the truck and put their head back for little while.  I'm not talking about sleeping for over maybe fifteen minutes at the most, because we're all busy most of the time.

---

[23]  APAC's company work rules can be found at Doc. 20-1 at 83-85.  Sleeping the job and insubordination are listed as violations.

(McKibbon, Doc. 20-6 at 115).  Greg Wilkins, an asphalt crew mechanic and 16-year APAC employee, answered "yes," when asked if he had ever observed people sleeping in their trucks but also answered that this was not common.  (Wilkins, Doc. 20-7 at 14-15).  He confirmed that resting might occur during down time, such as when the crew was waiting on asphalt.  (*Id.* at 15).  Smith denied that he had ever seen an APAC employee asleep on the job.  (Smith, Doc. 20-3 at 55).  Head also denied it.  (Head, Doc. 20-2 at 59).  Clark is the only APAC employee that ever has been reprimanded or terminated for sleeping on the job.[24]

Clark testified that he "felt" like Sam Head made the decision to terminate him.  (Clark, Doc. 20-1 at 93).  He asserted that "David Smith never would give me a name.  He just said "we," but once again, like I stated before, Sam Head was responsible for hiring and firing."  (*Id.* at  94).

Smith testified that he did not make the decision to fire Clark "by myself."  (Smith, Doc. 20-3 at 52-53).  When asked who helped him make the decision, Clark explained, "Anytime I terminated an employee, I always talked with Dana Gortney and Sam Head before the decision was made."  (*Id.* at 53).  When asked about his conversation with Gortney concerning Clark,[25] Smith testified that from what he

---

[24]  (Doc. 28-1 at 48, Defendant's Answers to Interrogatories).

[25]  Gortney testified that she played no role in Clark's termination.  (Gortney, Doc. 20-5 at 55).  She stated that she would receive phone calls when terminations (not suspensions) were being considered

remembered, he told her "what was seen, that Jeff was asleep in the truck when it was running on the job site." (*Id.* at 54). He could not remember her response. (*Id.*). When asked about his conversation with Head,[26/] Smith testified, "[I]t had to be the same effect of what was going on. He was my current boss or supervisor, and I always let him know of every termination that I've done." (*Id.* at 55). After the termination, Smith would provide Gortney and Head with the "[t]he write up, the termination sheet, the normal procedure for terminating an employee." (*Id.* at 53-54).

2.   *Analysis*

a.   *Whether Clark can establish a prima facie retaliation claim*

APAC does not deny Clark participated in protected activity when he filed his December 14, 2007, EEOC charge nor does APAC deny that Clark suffered an

---

and that she would read company policy. (*Id.* at 61). In other words, as HR Director, she would "read what the company's disciplinary policy is with regard to an incident and management makes the decision." (*Id.* at 56). As for Clark's termination, Gortney testified that Smith "called and said he had an incident where an employee was asleep on the job and wanted to know what our policy said. I read out working guidelines to him, and at that point, the decision was made." (*Id.* at 57). Gortney stated that Smith reported to her that Clark "had been repeatedly asked to come back after he put the tack out, to come back and help the paving crew and he didn't because he was asleep on the job." (*Id.*).

[26/] At his deposition, Head testified that he understood that Clark was fired for sleeping on the job and nothing else. (Head, Doc. 20-2 at 59-60). Head was asked three times in succession if he played any role in Clark's termination, to which he answered, "I did not," "No" and "None." (*Id.* at 60). Head stated he conducted no investigation into Clark's termination, did not make the decision to terminate Clark, and did not recall "who actually made the decision. " (*Id.* at 60-61). He added, "I knew after the fact he had been fired, or terminated. . . . I assume it was David Wright." (*Id.*).

adverse employment action when he was terminated on February 8, 2008, for alleged work rule violation.  (Doc. 18 at 4, ¶ 13); (Doc. 19 at 25-26).  Nonetheless, APAC declares that "temporal proximity alone does not establish the connection and plaintiff's sleeping on the job while on probation for another company violation was an intervening factor that would sever any potential connection between the two." (Doc. 19 at 25-26 (citing *e.g. Hankins  v. Airtran Airways, Inc.*, 237 Fed. Appx. 513, * at 520-21 (11th Circuit 2007) (holding that intervening misconduct can sever the temporal proximity connection between the protected conduct and the adverse employment)).

Although poorly delineated, Clark's opposition to APAC's argument appears to be threefold.  First, he correctly declares that the causal link element of his *prima facie* case requires him only to show that his protected activity and the retaliatory act are not *wholly unrelated*.  (Doc. 27 at 33) (quoting *Whatley v. Metropolitan Atlanta Rapid Transit Authority*, 632 F.2d 1325, 1328 (5th Cir., Unit B, 1980)).  He also asserts that APAC's temporal proximity (intervening factor) argument "is based on a skewed recitation of facts and applicable law." (*Id.* at 33).  This court is inclined to agree.  *Hankins, supra,* is an unpublished Eleventh Circuit case and therefore only may provide persuasive, not precedential, authority.  Moreover, the court notes factual distinctions between *Hankins's* and Clark's cases.  In *Hankins*, the plaintiff

was a probationary airline stewardess.  Hankins did complain her supervisor was discriminating against her by reprimanding her verbally and in writing for errors. After registering her complaint, Hankins admittedly cursed a fellow employee by threatening to kick his ass.  Two weeks later, Hankins was terminated on the basis that she had "failed to successfully complete her probationary period, and had violated Rule 1 and 14 of the AirTran Airways Crew Member Handbook, which prohibit, respectively, disrespectful, abusive, or unprofessional behavior, and using threatening or abusive language."  (*Hankins*, 237 Fed. Appx. 513, 517).    The Eleventh Circuit found that Hankins had established temporal proximity between the time that she complained her supervisor was unfairly punishing her and the airline's decision that she had not successfully completed her probation period.  However, the temporal proximity was severed by Hankins admitted interim misconduct – cussing another employee – and the airline stated its decision to part ways with Hankins rested in part on that admitted violation.

Clark, however, never has admitted he was at fault for the accident that resulted in his probation.  More importantly, and despite APAC's contention, none of the evidence shows that the probationary punishment Clark received for the accident was considered or played any part in the decision to terminate Clark on February 8, 2008. Instead, the evidence shows that only Clark's purported misconduct one day earlier

was considered when the decision to terminate him was made. For the foregoing reasons, the court finds that there were no intervening factors that severed the temporal proximity between Clark's December 2007 EEOC charge and his February 8, 2008, termination.

Finally, Clark asserts that "[t]here is a continuing pattern of retaliation and the retaliatory transfer is proof that the defendant and Sam Head are willing to retaliate." (Doc. 27 at 33-34). Clark does not explain how this conclusory sentence pertains to the causal link element of his *prima facie* case. He provides no factual allegations to underscore his bald assertion of "continuing pattern of retaliation" other than *one* discrete act that he contends was a "retaliatory transfer"[27] that occurred two years prior to his termination. Clark cannot establish the causal link element of his retaliation with one previous act so remotely separated from the date of his termination. Nor is it necessary that he do so to satisfy the *prima facie* element of his claim in light of the relationship between his December 2007 EEOC charge and his February 2008 termination.

Aside from Clark's conclusory assertions of "continuing retaliation" and "retaliatory transfer," this court finds that Clark has set out sufficient genuine

---

[27] For the reasons set out in footnote 17, *supra*, Clark has not established that his 2005 transfer to another asphalt crew was retaliatory.

disputed facts such that his burden to establish all elements of his *prima facie* claim of retaliatory termination have been met.

      **b.**      ***Whether APAC produced legitimate non-retaliatory reasons for Clark's termination***

APAC's burden to articulate legitimate non-retaliatory reasons for terminating Clark are exceedingly light. APAC declares that it fired Clark "for job misconduct after APAC learned of plaintiff sleeping on the job." (Doc. 19 at 26). The facts show that APAC fired Clark for sleeping on the job and insubordination, both of which are violations of APAC's work rules. Moreover, APAC has declared that Clark's particular act of sleeping on the job was a major safety hazard because it occurred in a running vehicle. Sleeping on the job is a terminable offense according to APAC's disciplinary policy. APAC has produced sufficient evidence of a legitimate non-retaliatory reason for its termination of Clark.

      **c.**      ***Whether Clark has met his burden of persuasion to show that APAC's stated reasons for his termination are pretext to retaliate***

To satisfy his ultimate burden of persuasion, Clark still must show that APAC's proffered legitimate, non-retaliatory reasons for the termination are pretextual. Like the retaliation claim in IV.A., *supra,* Clark's argument in opposition to APAC's motion for summary judgment contains no citations to the record or the parties'

Statement of Facts and consists of one run-on sentence.  (Doc. 27 at 33-34).  This sentence reads:

> The temporal proximity of the suspension of Wright, just weeks before he alleges that plaintiff was sleeping is more than adequate to show a causal connection.  Couple that with the testimony about the general practice of sleeping while waiting for asphalt coupled with the discrepancy about who did the firing and the testimony about Head's desire to get back at the plaintiff and the lies told by Wright and Smith, Wright's use of rap music to slam plaintiff with the word "nigger" and the general failure to investigate discrimination and the "disappearance" of the discipline against Wright for using racial slurs is more than adequate to determine that he firing was retaliatory.

(Doc. 27 at 33).

The court will engage in some attempt to address this multi-faceted sentence, but only to the extent that it can identify specific facts.  For this reason, Clark's attempt to establish pretext on the basis of his conclusory phrases "the general failure to investigate discrimination,"  and "the lies told by Wright and Smith" will not be considered.  *See Earley v. Champion Int'l Corp*., 907 F.2d 1077, 1081 (11th Cir. 1990) ("Mere conclusory assertions and allegations" do not suffice to establish pretext).  It is not the responsibility of the court to dig through the pleadings or the record in a speculative effort to determine what incident(s) or the scope of incidents to which Clark is referring.  This is equally true as to the issue of lies, a question

which in and of itself generally indicates the type of credibility or impeachment evidence left to the factfinder, and thus not pertinent to this court's inquiry unless they are material to the claim and outrageous to the extreme. Clark could have easily and specifically stated what he meant, cited the evidence, or even cited what he believed to be the applicable paragraphs in his Statement of Facts in order resolve this issue. He did not so.

The court shall organize the remaining proffered evidence of pretext in Clark's run-on sentence in a logical manner.

### i.      *Discrepancy about who fired Clark and the testimony about Head's desire to get back at Clark*

Clark declares that there is a discrepancy about who terminated him. He bases this discrepancy on an answer given by APAC in its answers to plaintiff's interrogatories, the testimony of Sam Head, and the testimony of David Smith. The answer identified APAC's Construction President Tim Mullendore, Construction Vice-President Sam Head, Dana Gortney (listed as Human Resources Manager) and David Wright (listed as paving foreman) as the termination decision-makers. (Doc. 20-2 at 65). APAC "concedes that in submissions by counsel for defendant there was a slight discrepancy as to the individuals responsible for making the termination

decision[,]" but argues that "any discrepancy was clarified by witnesses' testimony." (Doc. 30 at 5).   This court agrees.

The testimony overwhelmingly shows that Asphalt Superintendent David Smith made the final decision to terminate Clark.   Clark presents no evidence that David Wright or Sam Head made any recommendation to Smith about how to punish Clark.   Clark's evidence in opposition to the testimony is that he"felt' Head was the decision-maker and he generally believed that Head was responsible for hiring and firing.   Clark's feelings and uncorroborated belief are insufficient to dispute the testimony of Head and Smith that Smith was indeed the decision-maker.

Since Smith was the decision-maker, and Clark has shown no evidence that Head influenced Smith's decision in any way, Clark's contention that others told him that Head wanted to get rid of him or get back at him is irrelevant.[28]   Alternatively, for reasons already stated, the overwhelming majority of these statements are hearsay (or double-hearsay), and occurred more than two years before Clark was terminated in connection with a transfer that, contrary to Clark's allegations, was not retaliatory.[29]   The court individually will address two statements that were made closer to the 2008 termination date.   First, Clark contends that Robert Taylor told him

---

[28] *See* n. 15, s*upra*, for detail.

[29] *See* n. 16, *supra.*

Head had called Taylor (who had been a prior APAC crew employee) a month or two prior to Clark's 2008 termination and told Taylor that APAC was "going to bring him back to learn how to do the Distributor." (Doc. 27 at 30 (citing Clark, Doc. 20-1 at 184)). However, there is no testimony from Taylor submitted, and the statement attributed to him is inadmissible double-hearsay. Even if it were not, the statement does not indicate anything other than Head wanted to rehire and train Taylor to run a distributor truck. The only other statement of interest is Clark's contention that in 2007 Asphalt Foreman David Wright told him that Head wanted to get rid of Clark but that Wright would help him. (Doc. 27 at 30 (citing Clark, Doc. 20-1 at 52)). As it stands, the statement attributed to Wright is hearsay with no proof that it can be made admissible at trial. In any event, the court gives it little weight.

### ii.    *David Wright's use of rap music, racial slurs and the absence of written documentation for Wright's discipline and suspension*

Wright did play racially charged music in front of Clark. Still, the court fails to see how this evidence shows a pretext to retaliate. Wright was disciplined and punished for speaking to Clark in racially offensive manner just two weeks before he accused Clark of insubordination and sleeping. Even assuming Wright made up the infractions against Clark out of revenge, it is undisputed that Wright was not the decision-maker in Clark's termination and made no recommendations concerning that

matter whatsoever.  Clark correctly points out that APAC has not produced written documentation of Wright's reprimand and suspension.  However, Clark, Smith and Wright all testified under oath that Wright was reprimanded, punished with and served a three-day suspension for calling Clark a racially offensive name.  Since the undisputed evidence shows that Wright was disciplined and punished, the fact that APAC did not produce written documentation of it is of little import.

Clark may be attempting to argue that Wright's poor reputation and possible motivation for revenge were well known to Smith and that Smith should not have believed Wright's final write-up against Clark.  However, Smith chose to believe Wright, and there is no evidence that Wright influenced or made recommendations to Smith about Clark's punishment or that Smith's belief was the result of any retaliatory animus.  The fact that Wright had been disciplined for a making a racially insensitive remark to Clark does not mean that Smith had to ignore anything Wright might report to him about Clark from that point forward.  With knowledge of these facts, Smith chose to believe Wright.  Clark may quarrel with the wisdom of this decision, but he cannot show Smith's motivation was retaliatory.  This is especially so since Wright's previous attempt to get Clark disciplined resulted in Wright being the one disciplined by Smith.

Moreover, Smith also spoke with County Inspector Todd, an individual independent of APAC with no known animus against Clark, and Todd made the same to report Smith that Wright did. For purposes of this claim, it matters not whether it is true that Clark was sleeping in the truck while it was running, but whether Smith believed that Clark committed the infraction.

### iii.   *General Practice of Sleeping While Waiting on Asphalt*

Sleeping on the job is listed as a rule violation in APAC's written rules. Nonetheless, employees on APAC asphalt crews rest and take naps when they are waiting on asphalt. Clark proffers this evidence to establish that APAC's stated reason for his termination is a sham and a pretext to retaliate against him for his protected activities. This court would agree if APAC represented that it had terminated Clark for sleeping even though the incident occurred while Clark was waiting on asphalt. However, in Clark's case, APAC reason for termination is because he was asleep in a vehicle with the motor on, which was a serious safety hazard. Thus, this aspect of Clark's proffered evidence of pretext is not persuasive.

### 3.   *Conclusions*

Clark has not established genuine disputed material facts that would establish his burden of persuasion to establish that his termination was retaliatory. The evidence construed in Clark's favor shows that David Wright was a racially offensive

individual who accused Clark of insubordination and sleeping in his truck while it was running to retaliate against Clark for having complained to David Smith.  It is unknown why Wright's version of events also would be followed by County Inspector Todd.  However, for purposes of this claim, it matters not whether Wright and Todd's statements about Clark were true.  What is material is that David Smith believed the statements were true and that the statements (and not retaliation) were the basis upon which Smith made his decision to terminate Clark.  Clark obviously believes that Smith's investigation was poor and that Smith should not have believed the accusers.  Still,

> "a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons, at least not where . . . the reason is one that might motivate a reasonable employer." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997), *cert. denied*, *sub nom*., *Combs v. Meadowcraft Co.*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998); *see also Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999), *cert. denied*, 529 U.S. 1109, 120 S. Ct. 1962, 146 L .Ed.2d 793 (2000) (emphasizing that courts "are not in the business of adjudging whether employment decisions are prudent or fair.  Instead our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.")

*Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000).[30/]

For the foregoing reasons, defendant APAC's motion for summary judgment is due to be **GRANTED** and this claim **DISMISSED WITH PREJUDICE**.

## V.  FINAL CONCLUSION

For all of the above stated reasons, defendant APAC's motion for summary judgment is due to be **GRANTED** in its entirety and this case is due to be **DISMISSED WITH PREJUDICE**.

DONE this 5th day of December, 2012.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE

---

[30/] Although made in the context of a failure-to-promote claim, the court finds these principles equally applicable to retaliation claims.